GRIFFIS, P.J.,
for the Court:
¶ 1. This appeal considers the proper determination of the heirs of William Randy Ivy (“Randy”), deceased. The chancellor determined that Randy’s mother and siblings were the legal and proper heirs-at-law and wrongful-death beneficiaries. Le-gand Dakota Benton, through his mother, Kelly Brand, appeals the chancellor’s judgment. Legand argues that the chancellor committed reversible error in: (1) the admission of an affidavit and DNA test results into evidence, and (2) the conclusion that Randy’s mother and siblings were his legal and proper heirs-at-law and wrongful-death beneficiaries, rather than Le-gand. Finding reversible error, we reverse and remand for further proceedings consistent with this opinion.
FACTS
¶ 2. On October 21, 2006, Randy’s automobile collided with a train, and he died as a result of injuries sustained in the accident.
¶ 8. Joyce Ivy, Randy’s mother, filed a wrongful-death lawsuit in Kemper County Circuit Court. The defendant in that action challenged whether Joyce was indeed a proper plaintiff. The circuit court ordered Joyce to file a chancery action to determine Randy’s heirs-at-law and statutory wrongful-death beneficiaries.
¶ 4. On April 15, 2010, Joyce filed a petition for appointment of an administra-trix and for the issuance of letters of administration in the Chancery Court of Kemper County. Randy’s siblings, Ricky Ivy, Randall Ivy, Robin Woodall, and Rhonda Smith, joined in the petition. On May 11, 2010, the chancellor executed an order authorizing appointment of an ad-ministratrix and the issuance of letters of administration. Letters of administration were issued on May 11, 2010.
¶ 5. On June 18, 2010, Joyce, as adminis-tratrix, filed a petition to determine the wrongful-death beneficiaries and/or to determine the heirs-at-law of Randy. In the petition, Joyce claimed that Randy was not survived by a spouse or child and died intestate. Joyce also included the following allegation:
William Randy Ivy, deceased, is named as the “listed” but not the “biological” father on the birth certificate of Legand Dakota Benton, a minor male, who was born on December 21, 2004, to Kelly Nicole Brand, Mr. Ivy’s former spouse. A copy of the birth certificate of Legand Benton is attached hereto as Exhibit “B.” However, Legand Benton is not the biological child of William Randy Ivy as established by DNA tests[,] which confirm “Randy Ivy is excluded as the father of Legand Bentonf,]” and he “cannot be the biological father of Legand Benton.” A copy of the DNA test results are attached hereto as Exhibit “C.”
Joyce asserted that Legand was not an heir-at-law of Randy, but that Legand should be summoned “to fully adjudicate *229 the issue of heirship.” The petition asked the chancellor to hold a hearing and “determine and adjudicate who are the wrongful[-]death beneficiaries and/or heirs-at-law of William Randy Ivy, deceased.”
¶ 6. Kelly, as the natural mother and guardian of Legand, was served a Mississippi Rule of Civil Procedure 81 summons with notice of a hearing scheduled for September 9, 2010, at 1:00 p.m. in the Winston County Courthouse in Louisville, Mississippi. The hearing was held as scheduled, but was continued at the request of counsel.
¶ 7. By order dated October 4, 2010, the chancellor determined that all parties either appeared, waived process, or were properly served with process. David Lin-der appeared as counsel for Kelly Brand. The chancellor found that he had personal and subject-matter jurisdiction. The chancellor continued the September 9th hearing until October 13, 2010, and allowed the parties thirty days for discovery.
¶ 8. A hearing was held on October 13, 2010. The evidence offered at the hearing consisted of six exhibits and the testimony of two witnesses, Joyce Ivy and Kelly Brand. The following facts were presented at trial.
¶ 9. On June 18, 1998, Randy and Kelly married. At that time, Randy was forty years old, and Kelly was seventeen years old.
¶ 10. On May 28, 2004, Randy filed for divorce. Randy’s complaint for divorce did not identify any children born of the marriage. The complaint stated that no children were born of the marriage or were expected to be born. A final judgment of divorce was dated July 30, 2004. The judgment did not identify any children born of the marriage.
¶ 11. Legand was born on December 21, 2004. The front of Legand’s birth certificate (items 7a-7d) listed Randy as Legand’s father. The back of Legand’s birth certificate states:
I, William Randy Ivy (Name of Father), certify and acknowledge that I am the {□ natural father, [¾ listed father} of the child whose name appears in Item 1 of the birth certificate, and that all information in Items 7a-7d and 13-15 is correct. My Rights and Responsibilities and Right to Rescind have been explained to me. [Signed William Randy Ivy]
I, Kelly Ivy (Name of Mother), certify that I am the mother and acknowledge that the person named in 7a of the birth certificate is the {□ natural father, |x] listed father} of the child whose name appears in Item 1. My Rights and Responsibilities and Right to Rescind have been explained to me. [Signed Kelly Nicole Ivy]
Both certifications were notarized. There is no dispute as to the authenticity of the signatures.
¶ 12. The controversy here is whether Randy was Legand’s biological father. The chancellor was specifically asked to determine who was entitled to receive any benefits from the wrongful-death action filed against the alleged tortfeasor who caused Randy’s death. Either Legand was Randy’s sole heir and wrongful-death beneficiary or he was not.
¶ 13. Kelly testified that Legand was conceived when she was married to Randy. Kelly also claimed that Legand was born two months early. Kelly testified that she had unprotected sexual intercourse with Randy a couple of times a week, both before and after the divorce. Their last sexual encounter was the night before he died. Kelly also testified that she continued to have sex with Randy because it “didn’t feel like a divorce.” Kelly testified *230 that Randy purchased the tests that showed she was pregnant with Legand.
¶ 14. As to the birth certificate, Kelly testified that someone in vital records told her that Randy’s name had to appear on the birth certificate because she was married at the time of conception. Otherwise, Kelly said that she would have left “father” blank.
¶ 15. Kelly claims that the form, which is titled “Acknowledgement of Paternity/Name of Child,” is legally significant to establish Randy’s paternity. She argues that, even if DNA evidence shows Randy was not Legand’s father, it is indisputable that Randy was Legand’s father. Joyce argues this was a form to execute a name change, so that according to Kelly’s wishes, Legand could have a surname other than Ivy.
¶ 16. Joyce testified that Randy was not married at the time of his death. She also testified that Randy did not have a will. Randy and Kelly separated in November 2002. Joyce testified that Randy lived with her from the time of his separation from Kelly until his death. Joyce also testified that Randy was not present at Legand’s birth and that he had no physical similarities to Legand. Kelly testified that Randy and Legand have similar lazy eyes.
¶ 17. At the time of Legand’s birth, Michael Benton and Kelly lived together in a trailer. Joyce testified that she saw that the trailer had cardboard or plastic over its broken windows. Kelly testified that she herself broke the windows with a baseball bat. Joyce took Legand to her house because of the cold-weather exposure at Kelly’s trailer.
¶ 18. Kelly testified that Randy treated Legand like his son. As evidence of such, Kelly cites to Joyce’s treatment of Legand. Joyce testified that she did help take care of Legand. Joyce testified that Legand smelled of animal urine and lived in terrible conditions. Joyce testified that she saw a power cord and a water hose running from Kelly’s parents’ house to Kelly’s trailer. Joyce testified that she took care of Legand for the love of children. According to Joyce, Kelly told Joyce that she did not have money for medicine, so Joyce bought Legand’s medicine. Joyce also bought diapers and passed along clothes.
¶ 19. Kelly testified that Randy gave her cash, diapers, clothes, and food. This testimony was contradicted by her deposition testimony, where she had testified that Randy “wouldn’t give [her] cash.” Kelly testified that she and Randy spent a lot of time together and that they went out to restaurants, car races, and the casino. Kelly testified that Randy only bought formula once. Kelly testified that Michael, who lived with Kelly and Legand, never bought anything for Legand. Kelly testified that Michael never had a job since she had met him.
¶ 20. Joyce went to Kelly’s trailer two or three times a week, but not consistently. She visited probably five or six times a month. Her last visit was in December 2006, when she brought a tricycle to Le-gand. Once, she babysat Legand for a whole week because Kelly’s parents had asked her to do so. She claimed that it was necessary because Kelly’s parents had to work, and Kelly was in jail on felony embezzlement charges.
¶ 21. Kelly testified that around the time of Legand’s conception, she had multiple sexual partners who could be Le-gand’s father. Kelly testified, “I don’t know who the father is, and I don’t care.” Kelly testified that over two months after the separation, around January 2003, she moved in with James Tucker for nine months. She was sexually active with him. Then, she lived with her sister for an unknown amount of time. Michael and *231 Kelly then lived together with Johnny Tensley for an unknown period of time.
¶22. Next, Kelly and Michael moved into their own trailer before Legand’s birth. Over the course of a year, Kelly was sexually active off and on with Michael. She testified that she had sex with Travis Woodall and someone else, but she could not remember his name. Kelly testified about her behavior around the time of Legand’s conception:
Q You can’t remember his name at all?
A I think it was — I want to say it was David Sykes, but I’m not sure.
Q Why would you think you might have had sex with a man named David Sykes?
A Because I used to date him.
Q Well, but were you sleeping with him at the time you conceived your child Legand?
AI honestly couldn’t say Judge, because that was a time where I was — after I had gotten married so young. I was in my partying phase, and I was drinking every night. So I couldn’t tell you really much of nothing.
[[Image here]]
Q So are you saying that right now we can’t depend on your testimony as to what you’ve told us?
AI don’t know if you could or not.
¶ 23. Legand’s surname is “Benton,” the name of one of his potential fathers, Michael Benton. Kelly testified to the way she picked Legand’s last name: “I went through a phone book and picked out a name. I could have picked out Katmandu. Would you still be saying anything about it then? I mean, I could have named him anything I wanted. I just didn’t want him to have the Ivy name.”
¶ 24. Kelly also testified that Randy signed the birth certificate so she would not have to use the surname “Ivy” as Legand’s last name. She testified, “Honestly, I didn’t want him to sign my birth certificate to any acknowledgment.” In her deposition, Kelly testified that she did not want Legand to call Randy “daddy.”
¶ 25. Over the objection of Kelly’s counsel, Joyce also offered an “Affidavit [of] DNA Testing Results.” The affidavit read:
I, Roy William Scales, having been duly sworn under oath state the following:
1.
In the matter before the Social Security Administration in Lauderdale County, Mississippi, on the 6th day of November, 2006, I was authorized and appointed to perform all necessary blood tests on the following individuals for the purpose of reasonably proving or disproving the Alleged Father’s paternity of the child set forth below:
(a) the [M]other, Kelly N. Brand
(b) the Child, Legand D. Benton
(c) and the Alleged Father, Randy Ivy[,] ... Deceased.
¶ 26. Along with the affidavit, Joyce offered a letter dated April 9, 2008, on Scales Biological Laboratory Inc. letterhead, addressed to “Ms. Reed, Social Security Administration,” that was signed by R.W. (Bo) Scales, Ph.D, and Barbara M. Scales, as the laboratory supervisor. The letter appears to provide DNA results because it concludes, “Randy Ivy is excluded as the father of Legand Benton.... Therefore, Randy Ivy cannot be the biological father of Legand Benton.” (This letter is referred to as the “DNA results.”)
¶ 27. On April 8, 2011, the chancellor entered the opinion of the court. The chancellor found that Joyce “offered evidence beyond a reasonable doubt to rebut the presumption that [Randy] was the fa *232 ther of [Legand].” The chancellor determined that Kelly had candidly admitted that she had sexual relations with at least three men, maybe four. The chancellor then based his decision on the following facts that were offered to overcome the presumption that Raridy was Legand’s father:
1. Randy’s sworn Complaint for Divorce states that he separated from Kelly on or about November[ ] 2002, more than two years before Le-gand’s birth;
2. The Property Settlement Agreement signed by Randy on May 27, 2004, and by Kelly on June 1, 2004, acknowledges that “no children have been born of the marriage and no children are expected.” At the time[] Kelly executed the Agreement[,] she had to have known she was pregnant;
3. Kelly testified at'the heirship[-]de-termination hearing that she and Randy were separated for over a year before their divorce was granted and sixteen (16) months before Legand was born;
4. Randy never acknowledged- being Legand’s father;
5. Kelly admitted under oath that she did not know who was Legand’s father; and
6. DNA tests exclude Randy as Le-gand’s father.
¶ 28. The chancellor then ruled that “Randy Ivy’s heirs-at-law and wrongful[-]death beneficiaries are his mother, Joyce Ivy, and siblings, Ricky Ivy, Randall Ivy, Robin Woodall and Rhonda Smith.” The chancellor entered a final judgment on April 26, 2011, which was filed on May 3, 2011. On May 31, 2011, Legand filed a notice of appeal.
STANDARD OF REVIEW
¶ 29. We apply a limited standard of review to appeals from chancery court. Prout v. Williams, 55 So.3d 195, 197 (¶ 8) (Miss.Ct.App.2011) (citation omitted). We “will not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous.” Id. at 197-98 (¶ 8) (quoting Estate of Dykes v. Estate of Williams, 864 So.2d 926, 930 (¶ 9) (Miss.2003)). We review questions of law de novo. Id. at 198 (¶ 8).
ANALYSIS

1. Admissibility of the Affidavit and DNA Results

¶ 30. Kelly argues that it was reversible error for the chancellor to admit the affidavit and DNA results. Joyce argues that this evidence was properly admitted under the Mississippi Rules of Evidence, specifically Rules 803(6) and 902(11), or alternatively, under Rules 803(24) and 902(8).
¶ 31. “The standard of review regarding the admission or exclusion of evidence is whether the trial court abused its discretion.” Tatum v. Barrentine, 797 So.2d 223, 230 (¶ 29) (Miss.2001) (citation omitted).
¶ 32. Our review begins with the obvious. We must question whether the affidavit and the DNA results were one document or two separate documents. The affidavit was addressed to the Social Security Administration, and it was dated November 6, 2006. The DNA results were dated April 9, 2008. No witness sponsored or testified about these documents. It seems obvious, simply by looking at the different dates, that these were two separate documents. The affidavit, dated a year and a half earlier, can hardly be used to establish the veracity and reliability of the DNA results. Yet, the parties do not make an issue of the difference in dates, *233 and we do not rely upon this to reach our conclusion.
¶ 33. Kelly’s counsel objected to the admissibility of this evidence on the ground that the documents were hearsay. The chancellor overruled the objection and stated that the evidence was admissible under Mississippi Rule of Evidence 902(8). The chancellor then allowed additional argument by both attorneys. Then, the chancellor again stated, “I hold that it is admissible.” Nevertheless, in the record, the argument over admissibility continued. The chancellor finally stated, “I think it’s admissible,” without ruling which rule of evidence applied. The chancellor specifically discussed Rules 803(6), 803(24), 902(8), and 902(11) of the Mississippi Rules of Evidence.
¶ 34. The affidavit and DNA results certainly meet the definition of hearsay. The affidavit and DNA results were each “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” M.R.E. 801(c). “Hearsay is not admissible except as provided by law.” M.R.E. 802. This hearsay evidence could be admitted only if it met an exception of Mississippi Rule of Evidence 803 or 804.
¶ 35. In her brief, Joyce argues that the results were offered under Rules 803(6) and 902(11), and alternatively, under Rules 803(24) and 902(8). We consider each of these rules.

A. Mississippi Rules of Evidence 803(6) and 902(11)

¶ 36. Rule 803(6), titled “Records of Regularly Conducted Activity,” provides the following exception to the hearsay rule:
A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or self-authenticated pursuant to Rule 902(11) ....
(Emphasis added). Mississippi Rule of Evidence 902(11), titled “Certified Records of Regularly Conducted Activities,” provides that the following are self-authenticating:
(A) The records of a regularly conducted activity, within the scope of Rule 803(6), about which a certificate of the custodian or other qualified witness shows ... (iii) that the records were (a) made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (b) kept in the course of the regularly conducted activity; and (c) made by the regularly conducted activity as a regular practice.
[[Image here]]
(C)(i) Records so certified will be self-authenticating only if the proponent gives notice to adverse parties of the intent to offer the records as self-authenticating under this rule and provides a copy of the records and of the authenticating certificate. Such notice must be given sufficiently in advance of the trial or hearing at which they will be offered to provide the adverse party a fair opportunity to consider the offer and state any objections, (ii) Objections will be waived unless, within fifteen days after receiving the notice, the objector serves written specific objections or obtains agreement of the proponent or moves the court to enlarge the time, (iii) The *234 proponent will be responsible for scheduling a hearing on any objections and the court should hear and decide such objections before the trial or hearing at which they will be offered. If the court cannot rule on the objections before the trial or hearing, the records will not be self-authenticating.
(Emphasis added).
¶ 37. For a business record to be admitted under Rule 803(6), the party who offers the evidence must either: (1) call the record’s custodian to testify, or (2) comply with the self-authentication requirement of Rule 902(11). Joyce did not call a custodian of the record to testify. Thus, the DNA results could only be admissible under Rule 803(6) if Joyce complied with Rule 902(11). Rule 902(ll)(C)(i) specifically requires “notice to adverse parties of the intent to offer the records as self-authenticating under this rule.”
¶ 38. Joyce argues that the affidavit and DNA results were attached to the petition that was served on Kelly over two months before the hearing. Further, Joyce claims that Kelly was again presented the affidavit and DNA results at her deposition. Joyce argues that these actions were sufficient notice of the intent to offer the records.
¶ 39. The record and the Mississippi Rules of Evidence do not support Joyce’s argument. There is nothing in the record that would give Kelly, or more importantly her counsel, notice that Joyce intended to present only the affidavit and the DNA results without sponsoring testimony from a custodian or person with knowledge. Dr. Scales, or someone from Scales Biological Laboratory Inc., could have testified at the hearing to introduce the DNA results.
¶ 40. Instead, Joyce offered only hearsay evidence. She did not meet the exception in Rule 803(6). Rule 803(6) requires the party offering such evidence to give specific notice of the intention to offer a business record, without the custodian testifying as to the requirements of Rule 803(6). Upon the receipt of such notice, under Rule 902(11)(C), Kelly would have had either fifteen days to object to the admission of the self-authenticating document or subpoena Dr. Scales to testify.
¶ 41. Rule 803(6) is clear and specific. For a business record to be admitted into evidence under this exception, a party must have a witness testify or the record itself must be self-authenticated under Rule 902(11). Because Joyce did not provide the notice required under Rule 902(11), the chancellor was in error to admit the affidavit and DNA results.
¶ 42. We also note that neither the affidavit nor the DNA results are the type of documents admissible under Rule 803(6) as “kept in the course of a regularly conducted business activity.” In Palmer v. Hoffman, 318 U.S. 109, 113, 63 S.Ct. 477, 87 L.Ed. 645 (1943), the United States Supreme Court held that a train engineer’s statement after an accident was inadmissible because it was not made in the regular course of the railroad business, even though it may have affected the business. It was not “typical of entries made systematically or as a matter of routine to record events or occurrences” within the business operations. Id. It lacked the trustworthiness of such typical business entries. Id.
¶ 43. Scales Biological Laboratory was hired to perform DNA testing. It matters not who hired Scales to perform the test or for which, if any, court proceeding. DNA results are not a routine business record in Scales’s business. Certainly, the DNA results are a product of its work. A routine business record kept in Scales’ course of regularly conducted business activities would be items such as invoices for lab equipment purchased, reports on calibra *235 tion of test machines, or bookkeeping spreadsheets.
¶ 44. Like in Palmer, the record here was “not a record made for the systematic conduct of the business as a business.” Id. DNA results are not made “to reflect transactions with others[] or to provide internal controls.” Id.
¶ 45. “Regular course of business” finds its meaning “in the methods systematically employed for the conduct of the business as a business.” Id. at 115, 63 S.Ct. 477. Expert testimony cannot be admitted through an affidavit as to an ultimate issue through the business-record hearsay exception because such a record lacks the credibility and reliability of records that are “routine reflections of the day[-]to[-]day operations of a business.” Id. at 114, 63 S.Ct. 477. To decide otherwise would open “wide the door to avoidance of cross-examination.” Id.
¶ 46. We find that the chancellor erred when he admitted the affidavit and DNA results under Rules 803(6) and 902(11). However, it would be harmless error if there was another evidentiary basis that supported the chancellor’s decision. Therefore, we move to the other rules that the chancellor discussed that might have supported the decision to admit the affidavit and the DNA results.

B. Mississippi Rules of Evidence 80S(21) and 902(8)

¶ 47. Mississippi Rule of Evidence 803(24), titled “Other Exceptions,” provides the following hearsay exception:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.
(Emphasis added).
¶ 48. Rule 803(24) is commonly referred to as the “catch-all” exception. Similar to Rule 902(11), Rule 803(24) has a specific notice requirement. Again, there is no evidence to establish that Joyce’s counsel provided Kelly’s counsel with notice of her intent to offer hearsay, i.e., the affidavit and DNA results, as evidence at the hearing. Mere attachment of the documents to the petition and questioning in a deposition will not suffice for the required notice.
¶ 49. Finding lack of notice under Rule 803(24), it is not necessary that we consider Rule 902(8).
¶ 50. It is important to note that neither the Mississippi Rules of Civil Procedure nor the Mississippi Rules of Evidence permit trial by affidavit. There are rules that may permit affidavits to be admitted into evidence; but, in each of these circumstances, the rules provide safeguards before such affidavits are introduced.
¶ 51. We find that there was no eviden-tiary basis to support the chancellor’s decision to admit the affidavit and DNA results into evidence. We have found that these documents were hearsay and did not meet the requirements of Rules 803(6), 803(24), or 902(11). Since there was no basis to support the chancellor’s decision, *236 we conclude that the chancellor abused his discretion in the admission of this evidence.
¶ 52. We now consider whether there was substantial evidence, without the affidavit and DNA results, to support the chancellor’s decision that Joyce rebutted the presumption that Legand was Randy’s son, which applied because Randy and Kelly were married at Legand’s conception.
2.Application of the McLeod Presumption and Whether Joyce Sufficiently Rebutted the Presumption, Even Without the Inadmissible Evidence
¶ 53. In McLeod v. State Board of Health, 393 So.2d 479, 480 (Miss.1981), the supreme court held that “[t]he presumption that a child was conceived during wedlock and that the father of the child was the mother’s then husband, where the birth of the child was within nine months of the date of the decree of divorce, is one of the strongest presumptions known to the law.” However, this presumption is not conclusive and is rebuttable. Id.
¶ 54. Kelly argues that the chancellor was in error when he concluded that Joyce rebutted the McLeod presumption. This issue centers around Randy’s execution of the birth certificate, which Kelly refers to as the voluntary acknowledgment of paternity. As discussed below, this form was not a voluntary acknowledgment of paternity by Randy.
¶ 55. Randy and Kelly were divorced on July 30, 2004. Legand was born less than six months later, on December 21, 2004. Kelly was, therefore, pregnant before the divorce was final. Kelly conceived Legand while she was legally married to Randy. The McLeod presumption applies in this case.
¶ 56. The chancellor cited five facts besides the DNA results that demonstrated Joyce had rebutted the presumption of paternity:
1. Randy’s sworn Complaint for Divorce states that he separated from Kelly on or about November[ ] 2002, more than two years before Le-gand’s birth;
2. The Property Settlement Agreement signed by Randy on May 27, 2004, and by Kelly on June 1, 2004, acknowledges that “no children have been born of the marriage and no children are expected.” At the time[] Kelly executed the Agreement[,] she had to have known she was pregnant;
3. Kelly testified at the heirship[-]de-termination hearing that she and Randy were separated for over a year before their divorce was granted and sixteen (16) months before Legand was born;
4. Randy never acknowledged being Legand’s father;
5. Kelly admitted under oath that she did not know who was Legand’s father.
¶ 57. Kelly argues that the form Randy signed was a voluntary acknowledgment of paternity, as provided for in Mississippi Code Annotated section 93-9-28 (Supp. 2012). Joyce argues that the form was simply a name change for Legand, as provided for in Mississippi Code Annotated section 41-57-23 (Supp.2012). Joyce’s contention is that the form does not establish that Randy was Legand’s father.
¶ 58. This case requires the interpretation of the form used by the Department of Health. The title of the form is “Ac-knowledgement of Paternity/Name of *237 Child.”[1] The form gave Randy and Kelly the option to choose between “natural father” and “listed father.” We have found no authority in the statutes or Department of Health regulations that explains the difference between a “natural” and a “listed” father. A “natural” father appears to refer to the child’s biological father. We must decide what a “listed” father means. Certainly, the Department of Health determined that there was some legal significance between the “natural” as opposed to the “listed” father. It would seem that the “listed” father acknowledges that he is not the “natural” father.
¶ 59. Given this option, both Randy and Kelly checked “listed father.” The instructions on the form state:
1. This form cannot be used for paternity acknowledgement if the mother is married or was married at any time between the conception and birth of this child.
[[Image here]]
3. ... [F]or acknowledgement of paternity, only “natural father” may be checked.
In our opinion, the instructions clearly refute the dissent’s conclusion. If there was to be a legally significant “acknowledgement of paternity,” the form used certainly required that the “natural father” option be checked. Both Kelly and Randy checked “listed” father.
¶ 60. The chancellor allowed a blank version of this form to be admitted into evidence. The top of the blank form includes two boxes: one is next to the words “Name of Child,” and one is next to the words “Acknowledgement of Paternity.” Only part of the form actually signed was admitted into evidence. The part admitted did not include the boxes that could be checked to indicate whether the form executed a name change or a voluntary acknowledgment of paternity.
¶ 61. Kelly testified that she needed Randy’s signature on this form so that Legand’s surname could be coincidentally the same as her then boyfriend, Michael Benton. There was no evidence of Randy’s intent in the execution of this document.
¶ 62. Rule 19 — Paternity of the Mississippi Department of Health Rules Governing the Registration of Vital Events, in relevant part, states:
If the mother was married at the time of either conception or birth, or at any time between conception and birth, the name of the husband shall be entered on the certificate of birth as the father of the child.
(Emphasis added). Also, Rule 19 — Name of Child of these same rules, in relevant part, states:
If the mother was married at the time of conception or birth, or at any time between conception and birth, the surname of the child shall be that of the husband except that an affidavit filed at birth by both listed mother and father may alter this rule.
(Emphasis added). Mississippi Code Annotated section 41-57-23(2), which provides for child surname changes, in relevant part, states: “The surname of the child shall be that of the father except that an affidavit filed at birth by both listed mother and father may alter this rule.”
¶ 63. The evidence in this case clearly indicates Randy’s name was listed on Le- *238 gand’s birth certificate as his father. Randy’s name was used because Kelly appeared to be married to Randy at the time of Legand’s conception. Thus, Randy’s name was included on the birth certificate in accordance with Mississippi Department of Health Rule 19 — Paternity.
¶ 64. However, the birth certificate clearly identified Randy as Legand’s “listed” father, not his “natural” or biological father. Kelly too signed the birth certificate and acknowledged Randy’s distinction as the “listed” instead of the “natural” father. The legal significance of Randy’s execution of this form was that it did not establish paternity but instead allowed Le-gand to be named as his mother wished.
¶ 65. Kelly cited section 93-9-28 to argue that Randy acknowledged paternity. Section 93-9-28, titled “[p]rocedures for voluntary acknowledgement of paternity,” provides:
(1) The Mississippi State Department of Health in cooperation with the Mississippi Department of Human Services shall develop a form and procedure which may be used to secure a voluntary acknowledgement of paternity from the mother and father of any child born out of wedlock in Mississippi. The form shall clearly state on its face that the execution of the acknowledgement of paternity shall result in the same legal effect as if the father and mother had been married at the time of the birth of the child. The form shall also clearly indicate the right of the alleged father to request genetic testing through the Department of Human Services within the one-year time period specified in subsection (2)(a)(i) of this section and shall state the adverse effects and ramifications of not availing himself of this onetime opportunity to definitively establish the paternity of the child. When such form has been completed according to the established procedure and the signatures of both the mother and father have been notarized, then such voluntary ac-knowledgement shall constitute a full determination of the legal parentage of the child. The completed voluntary ac-knowledgement of paternity shall be filed with the Bureau of Vital Statistics of the Mississippi State Department of Health. The name of the father shall be entered on the certificate of birth upon receipt of the completed voluntary ac-knowledgement.
(2) (a) A signed voluntary acknowledgment of paternity is subject to the right of any signatory to rescind the acknowledgment within the earlier of:
(i) One (1) year; or
(ii) The date of a judicial proceeding relating to the child, including a proceeding to establish a support order, in which the signatory is a party.
(b) After the expiration of the one-year period specified in subsection (2)(a)(i) of this section, a signed voluntary acknowledgment of paternity may be challenged in court only on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger; the legal responsibilities, including child support obligations, of any signatory arising from the acknowledgment may not be suspended during the pendency of the challenge, except for good cause shown.
(c) During the one-year time period specified in subsection (2)(a)(i) of this section, the alleged father may request genetic testing through the Department of Human Services in accordance with the provisions of [Mississippi Code Annotated] [section 93-9-21 [ (Supp.2012) ].
*239 (d) The one-year time limit, specified in subsection (2)(a)(i) of this section, for the right of the alleged father to rescind the signed voluntary acknowl-edgement of paternity shall be tolled from the date the alleged father files his formal application for genetic testing with the Department of Human Services until the date the test results are revealed to the alleged father by the department. After the one-year time period has expired, not including any period of time tolled for the purpose of acquiring genetic testing through the department, the provisions of subsection (2)(b) of this section shall apply.
(3) The Mississippi State Department of Health and the Mississippi Department of Human Services shall cooperate to establish procedures to facilitate the voluntary acknowledgement of paternity by both father and mother at the time of the birth of any child born out of wedlock. Such procedures shall establish responsibilities for each of the departments and for hospitals, birthing centers, midwives, and/or other birth attendants to seek and report voluntary acknowledgements of paternity. In establishing such procedures, the departments shall provide for obtaining the social security account numbers of both the father and mother on voluntary ac-knowledgements.
(4) Upon the birth of a child out of wedlock, the hospital, birthing center, midwife or other birth attendant shall provide an opportunity for the child’s mother and natural father to complete an acknowledgement of paternity by giving the mother and natural father the appropriate forms and information developed through the procedures established in subsection (3). The hospital, birthing center, midwife or other birth attendant shall be responsible for providing printed information, and audio visual material if available, related to the acknowledgement of paternity, and shall be required to provide notary services needed for the completion of acknowl-edgements of paternity. The information described above shall be provided to the mother and natural father, if present and identifiable, within twenty-four (24) hours of birth or before the mother is released. Such information, including forms, brochures, pamphlets, video tapes and other media, shall be provided at no cost to the hospital, birthing center or midwife by the Mississippi State Department of Health, the Department of Human Services or other appropriate agency-
Joyce cited Mississippi Code Annotated section 41-57-23(2), titled “[plroceedings to correct birth certificate containing major deficiencies,” which provides:
If a child is born to a mother who was not married at the time of conception or birth, or at any time between conception and birth, and the natural father acknowledges paternity, the name of the father shall be added to the birth certificate if a notarized affidavit by both parents acknowledging paternity is received on the form prescribed or as provided in [Mississippi Code Annotated sjection 93-9-9 [ (Supp.2012) ]. The surname of the child shall be that of the father except that an affidavit filed at birth by both listed mother and father may alter this rule. In the event the mother was married at the time of conception or birth, or at any time between conception and birth, or if a father is already listed on the birth certificate, action must be taken under [sjection 41-57-23(1) to add or change the name of the father.
¶ 66. Indeed, section 93-9-28 permits the voluntary acknowledgment of paternity by a child’s natural or biological father. *240 Reading the form signed by Randy in conjunction with the relevant rules governing the execution of a birth certificate, we cannot conclude that Randy signed a voluntary acknowledgment of paternity when he signed this form and indicated he was the child’s “listed” father. Within two days of Legand’s birth, both Randy and Kelly had an opportunity to establish Randy’s paternity of Legand. Neither took the opportunity to do so. Randy signed the form as Legand’s “listed” father instead of his “natural” father. Kelly apparently agreed. As a result, we find that Randy’s execution of the birth certificate did not establish his paternity of Legand under section 98-9-28 or the relevant rules. Instead, the execution of this form only permitted Legand to be named “Benton” instead of “Ivy,” in accordance with Rule 19 — Name of Child.
¶ 67. The dissent argues that there had been a “prior determination of Randy’s paternity by his voluntary acknowledgment before his death.” The dissent cites a number of cases that discuss the legal significance of the execution of a voluntary acknowledgment of paternity.
¶ 68. The dissent cites In re Farmer, 964 So.2d 498, 500 (¶¶ 4-5) (Miss.2007), for the position that a voluntary acknowledgment of paternity prior to death is a determination of paternity. There, the deceased had never been married to the mother of his illegitimate child. Id. at 499 (¶ 2). Because the mother was unmarried, it was optional to list a father on the birth certificate, even so she listed the deceased. See id. The deceased acknowledged the birth certificate and acknowledged paternity. Id. The court ruled that “[s]ection 93-9-28 ... establishes a procedure by which the natural father of an illegitimate child may voluntarily acknowledge the child as his own.” Farmer, 964 So.2d at 499-500 (¶ 4) (emphasis added). Unlike in Farmer, here the form was different. Randy checked “listed” father, not “natural” father. Randy’s name was only on the front of the birth certificate as the “father” of Legand because he was required to be “listed” there according to the Health Department regulations because he was married to Kelly at the time of Legand’s conception. The facts and issues in Farmer are not similar to this case.
¶ 69. Next, the dissent cites Hogan v. Buckingham, 730 So.2d 15 (Miss.1998) for the proposition that Joyce lacked standing to raise the issue of Legand’s paternity in the heirship proceeding because the form Randy signed was determinative. In Hogan, the court considered an heirship determination where there had been a prior adjudication of paternity; i.e., there were judgments that established paternity. Id. at 16 (¶ 1), 17 (¶ 5). An adjudication is “the process of judicially deciding a case” or a “judgment.” Black’s Law Dictionary 47 (9th ed.2009). Here, contrary to the dissent’s suggestion, no court had adjudicated Legand’s paternity.
¶ 70. In footnote 5, the dissent cites Adcock v. Van Norman, 917 So.2d 86 (Miss.2005). Adcock involved a man and woman who were never married, and there was a clear and unequivocal signed voluntary acknowledgment of paternity. Id. at 88 (¶ 3). The legal father in Adcock marked “natural father” on the form. Id. Here, neither Randy nor Kelly checked “natural father.” The form, according to its instructions, in Randy’s instance, operated as a name change and not as a voluntary acknowledgment of paternity.
¶ 71. The dissent also cites Madden v. Madden, 338 So.2d 1000, 1001-02 (Miss.1976), for the argument that the chancellor disregarded Mississippi Code Annotated *241 sections 93-9-10(3)(b)[2] and 91-l-15(3)(b)[3] (Supp.2012) when he allowed the challenge to the “prior determination of legitimacy of Legand,” the form. The decision in Madden involved a petition for writ of habeas corpus and child custody; the chancellor there “included in the decree an adjudication that appellant husband was not the father of the child.” Madden, 338 So.2d at 1001 (emphasis added). Madden does not involve either of these statutes cited by the dissent, but concerns the issue of child custody.
¶ 72. The dissent cites Thornhill v. Van Dan, 918 So.2d 725, 732-33 (¶¶ 31-32) (Miss.Ct.App.2005), with the statement that the alleged father’s name on the birth certificate “has legal significance.” This Court’s decision in Thornhill involved a child-custody dispute where a child was born before the parties were married. Id. at 727 (¶¶ 1-2). Unlike Randy, the man listed on the birth certificate in Thornhill was twice adjudicated by the court as the child’s father. Id. at 728 (¶ 9) (emphasis added). After the sentence that used the term “legal significance,” this Court again recognized that there was a judgment that clearly adjudicated who was the legal father. Id. at 733 (¶ 31). The sentence about “legal significance” contains a footnote that refers to the birth-certificate procedure for a father’s name when the mother is unmarried at the time of conception or birth. Id. at 733 n. 1. This is not the scenario in the instant case where Legand’s mother was married at the time of conception. The regulations required the former husband’s name to be listed on the birth certificate. Where the child was conceived while the mother was married, the father’s name is not optional on the birth certificate like that of an unmarried mother. Thornhill does not support the dissent’s position.
¶ 73. The dissent cites In re Johnson, 767 So.2d 181, 186 (¶ 17) (Miss.2000), where the birth certificate possessed “sufficient indicia to indicate trustworthiness,” despite irregularities. The birth certificate in Johnson was from 1931. Id. at 185 (¶ 14). At that time, if the child was illegitimate, a father’s name could not be listed. Id. Yet, the illegitimate child’s birth certificate there listed a father. Id. The supreme court quoted Rule 803(24) and found that the birth certificate there was admissible because it sufficiently indicated trustworthiness. Johnson, 767 So.2d at 186 (¶ 17). Since 1931, the Health Department’s Rules have changed.
¶ 74. As discussed earlier, based on the current regulations, Legand’s birth certificate is accurate because of the fact that Kelly and Randy were married at the time of Legand’s conception, and therefore Randy’s name was required to be “listed” on the front of the birth certificate. Miss. Dep’t of Health Rules Governing the Reg *242 istration of Vital Events, Rule 19 — Paternity. Listing a father is optional when a mother was unmarried at the time of conception. The Johnson case did not involve a voluntary acknowledgment of paternity. During the heirship determination in Johnson, the chancellor adjudicated, the child to be the biological son of the father.
¶ 75. An adjudication is “the process of judicially deciding a case” or a “judgment.” Black’s Law Dictionary 47 (9th ed.2009). Paternity of Legand has not been adjudicated. According to the form that Randy signed, because Randy did not check “natural” father and because Kelly was married at Legand’s conception, the form could not operate as a voluntary acknowledgment of paternity.
¶ 76. The dissent argues that because Randy raised no challenge to the form any challenge now must be on the basis of fraud, duress, or material mistake of fact. The dissent also argues that the heirship determination was a posthumous attempt to disestablish Randy as the legal father of Legand under section 93-9-10(3). These arguments are based on the form being a voluntary acknowledgment of paternity. However, the form itself provides in this situation that it cannot act as a voluntary acknowledgment of paternity, but can operate as a name change. There cannot be an attempt to disestablish paternity if it was never actually established since the form could not operate as a voluntary acknowledgment of paternity where the mother “was married at any time between the conception and birth of’ Legand.
¶ 77. The form Randy signed did not operate as a voluntary acknowledgment or adjudication of paternity. Where paternity was not legally established prior to Randy’s death, a person claiming to be the illegitimate child of Randy “must obtain an adjudication of paternity after the death of the intestate, based upon clear and convincing evidence, in an heirship proceeding under Mississippi Code Annotated sections 91-1-27 and 91-1-29 [ (Rev.2004) ].” In re Estate of Brewer, 755 So.2d 1108, 1111 (¶ 12) (Miss.Ct.App.1999) (citation and quotation marks omitted).
¶ 78. With respect for the dissent, we are of the opinion that the cases cited do not support the dissent’s conclusions.
¶ 79. We do, however, recognize that there was conflicting testimony about the amount of support that Randy and his family provided Legand. The record does not reflect that Randy ever told anyone that he was Legand’s father. More importantly, Kelly even testified that she did not know who was Legand’s father. She did not testify that Randy was Legand’s father, but she did testify that she did not want Legand to call Randy “daddy.”
¶ 80. Based on our conclusion that the trial court erred in the admission of the affidavit and the DNA results and our finding that the birth certificate did not clearly establish Randy as Legand’s father, we conclude that there was not sufficient evidence before the chancellor to determine whether Randy was indeed Le-gand’s biological father.
¶ 81. Accordingly, we have determined that the proper result of our reversal is to remand this case for further proceedings as to the issue of the legal and proper heirs-at-law and wrongful-death beneficiaries of Randy Ivy. We therefore reverse and remand this case for further proceedings consistent with this opinion.

3. Response to Dissent’s Argument on Joyce’s Standing to Bring Petition to Determine Heirship

¶ 82. The dissent finds that the chancellor erred in allowing Joyce “to challenge Legand’s legitimacy and the prior determination of Randy’s paternity by his *243 voluntary acknowledgment before his death.” The dissent claims that Joyce did not have standing to challenge Legand’s legitimacy and paternity. The problem with this argument is that it was not an issue presented to this Court. The appellant’s brief, filed on behalf of Legand, does not assert the lack of standing as an issue on appeal.
¶ 83. In the chancellor’s opinion, the chancellor held:
it is important to note that this is not a paternity case, but rather a suit to determine heirs and wrongful[-]death beneficiaries of Randy Ivy. It is for this reason that Kelly’s position that the pending matter is time[-]barred and that the Administratrix lacks standing to bring this suit to determine heirs is not well taken. While Joyce as Administra-trix might be prohibited from bringing] a paternity action regarding the child in question, she is not prohibited from contesting the paternity of someone claiming to be an heir of her son.
I can find nothing in the appellant’s briefs that indicate he challenges this finding on appeal. Thus, if the appellant does not challenge this finding, this Court may hot consider the issue as a basis to find reversible error.
¶ 84. There is precedent for Joyce to file a petition to determine heirs. In In re Estate of Richardson, 695 So.2d 587, 588 (Miss.1997), the administrator filed a petition in probate proceedings to determine heirship of purported illegitimate children for purposes of the wrongful-death statute. Mississippi Code Annotated section 11-7-18 (Rev.2004) provides that an illegitimate child may recover damages for the death of his natural father “if the survivor has or establishes the right to inherit from the deceased under [s]ection 91-1-15.” The supreme court held that “the administrator was certainly authorized to determine the heirship of reputed illegitimate children for purposes of the wrongful[-]death statute.” Richardson, 695 So.2d at 589. “An administrator of an estate has both the standing and the duty to file a petition to determine heirs.” Id. (emphasis added). The illegitimate children were required to establish paternity by clear and convincing evidence in order to be declared heirs. Id.
¶ 85. Further, in In re Estate of Stowers, 678 So.2d 660, 662 (Miss.1996), the supreme court held that an administratrix has a duty to protect the assets of the estate. That duty includes the duty “to contest all claims against the estate that may properly and in good faith[ ] be contested.” Id. The administratrix in that case “was obligated to contest paternity as the one in the shoes of the descendant.” Id. (emphasis added).
¶ 86. Under both Stowers and Richardson, Joyce, as administratrix, had an obligation to contest Legand’s paternity, in the heirship proceeding, because she stood in the shoes of the deceased, Randy, and thus had standing. Stowers, 678 So.2d at 662; Richardson, 695 So.2d at 589.
¶ 87. Indeed, the chancellor was correct. Joyce, as the administratrix of Randy Ivy’s estate, had the statutory obligation to make sure the chancery court properly determined the wrongful-death heirs of Randy Ivy. Joyce did not assert a paternity claim. Even though the chancellor’s decision was not asserted as error in Legand’s briefs, Joyce had standing to bring a petition to determine the heirs of Randy Ivy.
¶ 88. If the dissent is correct that Joyce did not have standing, and the petition was brought by a person without standing, the proper disposition would not be to reverse and render as the dissent suggests. Instead, “[a] lack of standing *244 ‘robs the court of jurisdiction to hear the case.’ ” Pruitt v. Hancock Med. Ctr., 942 So.2d 797, 801 (¶ 14) (Miss.2006) (quoting McNair v. U.S. Postal Serv., 768 F.2d 730, 737 (5th Cir.1985)). Thus, any ruling on a case brought by someone who lacked standing is void ab initio. Tolliver ex rel. Wrongful Death Beneficiaries of Green v. Mladineo, 987 So.2d 989, 995 (¶ 16) (Miss.Ct.App.2007). If Joyce did not have standing, the proper disposition would be to dismiss her appeal. This Court would not have the authority to render a decision.
¶ 89. THE JUDGMENT OF THE CHANCERY COURT OF KEMPER COUNTY IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
LEE, C.J., IRVING, P.J., BARNES, ISHEE, ROBERTS, MAXWELL, RUSSELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.

. After Legand’s birth, the Vital Records division of the Mississippi State Department of Health separated the "Name of Child” form and the "Acknowledgement of Paternity” form. The revised "Acknowledgement of Paternity” form continues to state it cannot be used to acknowledge paternity if the mother was married between conception and birth.

. Section 93-9-10(3)(b) considers descent among illegitimates; it provides:
"Notwithstanding subsection (2) of this section, a court shall not set aside the paternity determination or child support order if the legal father engaged in any of the following conduct: ... (b) Consented to be named as the biological father on the child’s birth certificate and signed the birth certificate application or executed a simple acknowledgment of paternity and failed to withdraw consent or acknowledgment within the time provided for by law in Sections 93-9-9 and 93-9-28, unless he can prove fraud, duress or material mistake of fact.

. Section 91 — 1—15(3)(b) provides:
"An illegitimate shall inherit from and through the illegitimate's natural father and his kindred, and the natural father of an illegitimate and his kindred shall inherit from and through the illegitimate according to the statutes of descent and distribution if: ... (b) [tjhere has been an adjudication of paternity or legitimacy before the death of the intestate.