# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00676-COA

**JONATHAN DARRELL ODOM A/K/A**               **APPELLANT**
**JOHNATHAN DARRELL ODOM**

**v.**

**STATE OF MISSISSIPPI**                            **APPELLEE**

DATE OF JUDGMENT: 06/18/2021
TRIAL JUDGE: HON. CALEB ELIAS MAY
COURT FROM WHICH APPEALED: SCOTT COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT: OFFICE OF STATE PUBLIC DEFENDER
BY: MOLLIE MARIE McMILLIN
JONATHAN DARRELL ODOM (PRO SE)
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: LAUREN GABRIELLE CANTRELL
DISTRICT ATTORNEY: STEVEN SIMEON KILGORE
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 09/26/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.    Jonathan Odom was convicted of murdering his co-worker Salvador Flores just after they both left work, where an altercation had ensued between them earlier that day. Following his conviction, the Scott County Circuit Court sentenced Odom to serve life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Odom filed post-trial motions for a new trial or for judgment notwithstanding the verdict, which the trial court denied. Odom appeals his conviction alleging the trial court committed reversible error regarding various hearsay and authentication evidentiary rulings during the course of

trial. He also alleges that his conviction is not supported by sufficient evidence. Finding no reversible error, we affirm.

**STATEMENT OF THE FACTS**

¶2. In February 2018, Odom and Flores were working for Onin Staffing and were both assigned to jobs at Peco Foods in Sebastapol, Mississippi. On February 8, 2018, Odom and Flores had an altercation at work.[1] The men reported the dispute to their supervisor, John Bergin, and he separated their workspaces for the rest of the day. Bergin testified that both Odom and Flores were "frustrated." Odom and Flores clocked out and left work within minutes of each other. Flores's timecard from that day shows that he clocked out at 3:58 p.m., and Odom's time card shows that he clocked out at 4:00 p.m.

¶3. Surveillance video from Peco of the two men leaving work was admitted at trial. The video showed Flores's car leave through the south gate and head south on Highway 21 towards Forest, Mississippi. The video and trial testimony show Odom's silver van leaving from the north gate approximately ten seconds later and heading south towards Forest on the same road, behind Flores. Bergin testified that he also left around the same time as Odom and Flores, and headed south on Highway 21 toward Forest. About two miles south of Peco Foods, Bergin saw a car wrecked in a ditch with smoke coming from the hood. He pulled his vehicle to the side of the road and called 911. Bergin checked on the person in the vehicle and saw that the man was bleeding from the side of his head and was unresponsive. At the time, Bergin was not aware that the unresponsive male was Flores.

---

[1] Salvador Flores is also referred to as Hector Garcia throughout parts of the record on appeal.

¶4.     A paramedic arrived on the scene and noticed that the man, later confirmed to be Flores, had a bullet hole behind his left ear. The paramedic also noted that there were bullet holes in the driver's side door and in the passenger seat headrest. He observed that Flores did not have a pulse and that there was brain matter on the dash of the car, which he presumed was from the exit wound in Flores's head. The paramedic did not perform any life-saving measures, and Flores was pronounced dead.

¶5.     Agent Heather Richardson of the Mississippi Bureau of Investigations testified that she was called to the scene and led the investigation. She observed Flores with a bullet wound behind his left ear, heavy damage to the front end of his car, a shattered driver's side window, and tire marks and tire rubber on the driver's side door. She also noticed the passenger seat headrest had bullet holes and bullet fragments. In the course of her investigation, Agent Richardson learned that Flores had been in an altercation with Odom at work that same day. She interviewed their coworkers and learned that Odom claimed Flores put his hands on Odom, and as a result, both of them were called to a meeting with their employer at the Onin Staffing office in Forest that same day. Odom was supposed to have a meeting at Onin at 4:00 p.m., and Flores was supposed to have a meeting at Onin at 4:15 p.m. Agent Richardson further learned that Odom had not shown up to his scheduled meeting. Odom also failed to show up for work the day after the murder and subsequent attempts to contact him were not successful.

¶6.     After observing Peco's surveillance video of Odom leaving work in his silver van immediately before the murder, Agent Richardson learned he purchased the van from Jason's

3

Auto Sales (Jason's Auto) in Forest, Mississippi. Agent Richardson contacted Jason's Auto and confirmed that Odom purchased a 2005 silver Buick Terraza van and the presence of a lien on Odom's van through Jason's Auto. Further, Jason's Auto confirmed they had installed a global positioning system (GPS) device due to the lien. Richardson then obtained a search warrant for the GPS location data maintained by Jason's Auto. Thereafter, she used the GPS data to locate Odom's vehicle in Lima, Ohio. Over a month later, investigators in Lima tracked down Odom's van, sent pictures of it to Agent Richardson, and towed it to the police station in Ohio for processing. Odom was apprehended over two months after the murder by police in Ohio during the execution of an unrelated narcotics search warrant where he happened to be present at the residence. After learning his identity, Ohio officers arrested him on the warrant for murder obtained by Agent Richardson and transported him back to Mississippi, where he was convicted of first-degree murder.

## STANDARD OF REVIEW

¶7.     "When reviewing the evidentiary rulings of a trial court, this Court employs an abuse of discretion standard." *Walters v. State*, 206 So. 3d 524, 534-35 (¶30) (Miss. 2016) (citing *Brown v. State*, 965 So. 2d 1023, 1026 (¶10) (Miss. 2007)). On appeal, we "grant[] a high degree of deference to the trial court's decision to suppress or admit evidence[.]" *Roberts Contracting Inc. v. Mersino Dewatering Inc.*, 270 So. 3d 994, 1002 (¶25) (Miss. Ct. App. 2018) (quoting *Cassibry v. Schlautman*, 816 So. 2d 398, 403 (¶17) (Miss. Ct. App. 2001). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Russell v. State*, 364 So.

4

3d 688, 701 (¶48) (Miss. Ct. App. 2021) (quoting *Jackson v. State*, 245 So. 3d 433, 439 (¶32) (Miss. 2018)).

¶8.     Conversely, the trial court's "[r]ulings on the sufficiency of the evidence claims are reviewed de novo." *Beasley v. State*, 362 So. 3d 112, 121 (¶31) (Miss. Ct. App. 2023). "When a challenge to the sufficiency of the evidence is raised on appeal, the relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id*. at 121-22 (¶31) (quoting *McLaughlin v. State*, 338 So. 3d 705, 717 (¶33) (Miss. Ct. App. 2022)). On appeal, this Court must "view all of the evidence in the light most favorable to the prosecution, accept all the evidence supporting the verdict as true, and give the prosecution the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Melendez v. State*, 354 So. 3d 944, 951-52 (¶30) (Miss. Ct. App. 2023) (quoting *Garrett v. State*, 344 So. 3d 849, 851 (¶12) (Miss. 2022)). "[W]e must affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 952 (¶30) (quoting *Garrett*, 344 So. 3d at 851 (¶12)).

## DISCUSSION

¶9.     Odom raises two types of issues on appeal. First, Odom argues that "the trial court made multiple erroneous evidentiary rulings that prejudiced [his] case." Second, he claims that his conviction is not supported by sufficient evidence.[2]

---

[2] After the State filed its appellee's brief, Odom, pro se, submitted a hand-written letter to this Court. The letter was addressed to the Scott County Circuit Court and titled, "Motion to Dismiss Charges for Failure to Provide a Fast and Speedy Trial." He claimed his constitutional and statutory rights to a speedy trial were violated. The State then filed a

## I. Evidentiary Rulings

¶10. Odom first alleges that the trial court erred by admitting into evidence computer printouts of vehicle locations; vehicle photographs from out-of-state investigators; vehicle photographs provided by the business owner; and crime laboratory ("crime lab") documents related to paint-transfer evidence. He claims that the court's errors in the admission and exclusion of these items of evidence were an abuse of discretion warranting this Court to reverse and remand his conviction for a new trial. After a review of the record, we find that the trial court's evidentiary rulings do not require a reversal of Odom's conviction.

### A. Computer Printouts of GPS or Location Data

¶11. The first item of contested evidence is a set of computer printouts proffered by the State and admitted into evidence from a local car dealer's computer system, depicting time-specific geographical data and coordinates for the vehicle registered to Odom. Odom claims that the admission of the computer printouts was error on the grounds that they contained inadmissible hearsay and were not properly authenticated.

¶12. As part of her testimony, Agent Richardson identified the evidence from Jason's Auto

---

motion before this Court to supplement the record on appeal with a transcript of the trial court's hearing on the speedy-trial claim, which resulted in the trial court's order denying Odom's motion. This Court granted the State's motion to supplement the record on appeal, which this Court received. The State then filed a supplemental brief addressing the speedy-trial claim. We have reviewed the parties' filings and the supplemental record and find no reversible error. Odom fails to cite any relevant authority for his claim in the two pages of his handwritten filing. *See* M.R.A.P. 28(a)(7). An attached printout of citations followed by an online version of the murder statute of which he was convicted does not show how these documents support his claim. "[A]ppellate courts in Mississippi will not review any issues on appeal if the party fails to cite relevant authority in support of his or her arguments." *Lambert v. Lambert*, 872 So. 2d 679, 683 (¶14) (Miss. Ct. App. 2003).

as a set of documents that she personally observed an employee of Jason's Auto locate on their computer system. She personally observed the employee sign into his account on the system, conduct a search with Odom's vehicle information, retrieve the historical location data of the van registered to Odom, and print out the information provided on the computer screen. As a matter of description, the exhibit is a fourteen-page document, with each page consisting of Google satellite images that contain digitally placed markers or tacks on the image. Below the satellite image on each page is a set of information, which contains the location, date, and speed information pertaining to the markers placed on the images. For purposes of our analysis, we are mindful that more than one type of evidence or information is found within the exhibit of the computer printouts.

¶13. As a foundational principle, we note that "[h]earsay is a statement that '(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement.'" *Taylor v. State*, 353 So. 3d 1114, 1125 (¶58) (Miss. Ct. App. 2023) (quoting MRE 801(c)(1)-(2)). "[A] statement is defined as 'a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.'" *Walters*, 206 So. 3d at 535 (¶31) (quoting MRE 801(a)).

¶14. As applied in Mississippi case law, this Court has "[found] that [a] Google Earth image alone was not hearsay. The image in this case makes no assertion; rather, it 'merely depicts a scene as it existed at a particular time.'" *Taylor*, 353 So. 3d at 1126 (¶54). Also, our supreme court has held that "a photograph does not meet the definition of a 'statement,' so it cannot qualify as hearsay under our rules of evidence." *Walters*, 206 So. 3d at 535 (¶31)

7

(Miss. 2016) (citing *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1109 (9th Cir. 2015) ("[A] photograph merely depicts a scene as it existed at a particular time . . . . Because a satellite image, like a photograph, makes no assertion, it isn't hearsay.")). Therefore, the Google images contained within the document are not by themselves hearsay.

¶15. However, the computer printouts proffered by the State also included data that was the work of the computer program, therefore produced by a computer-generated system. Within the Google satellite images is a digitally added tack or marker, presumably consistent with the GPS latitude/longitude and chronological data beneath each of the Google images specific to Odom's van that were the result of data entered into the computer by the representative of Jason's Auto.

¶16. Rule "901 requires that evidence be authenticated as a condition of being admitted." *Id*. at 1126 (¶66) (citing MRE 901(a)). In other words, before a court allows "its admission into evidence, a document or photograph must be authenticated." *Crutcher v. State*, 68 So. 3d 724, 730 (¶12) (Miss. Ct. App. 2011). If "a prima facie case is made, the evidence [then] goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court.'" *Taylor*, 353 So. 3d at 1127 (¶66) (quoting *Smart v. State*, 337 So. 3d 722, 728 (¶24) (Miss. Ct. App. 2022)). But "[w]ithout such authentication, the evidence must be excluded." *Id*. at 1127 (¶70).

¶17. The general "test for authenticating and admitting electronic evidence requires the proponent offer a foundation from which the jury could reasonably find the evidence is what the proponent says it is." *Webb v. State*, 339 So. 3d 118, 128 (¶33) (Miss. 2022). However,

8

our supreme court has explained that "the circumstantial evidence that tends to authenticate a[n] [electronic] communication is somewhat unique to each medium." *Smith v. State*, 136 So. 3d 424, 432 (¶18) (Miss. 2014). "[W]hen faced with an authentication objection, the proponent of [computer-program] generated evidence would have to establish [the computer program's] reliability and accuracy.'" *Taylor*, 353 So. 3d at 1127 (¶69) (quoting *Lizarraga-Tirado*, 789 F.3d at 1110). "Such a step is crucial because . . . '[t]he real work is done by the computer program itself.'" *Id*. at 1127 (¶70) (quoting *Lizarraga-Tirado*, 789 F.3d at 1110). Similar to *Taylor*, in this case, there was no attempt to demonstrate that the digitally added information was accurate or reliable in any manner. As we point out in *Taylor*, a programmer or witness who frequently works with and relies on the computer program could have sufficiently met the required burden for admissibility. *Id*.[3]

¶18.    Agent Richardson was not a qualified witness to authenticate the computer records because she did not compile the report, create the initial records, or manage the computer records for Jason's Auto. Further, she did not testify that she was familiar with Jason's Auto procedures for installing GPS devices on vehicles, the GPS data system utilized, or the manner in which the computer system processed GPS information. Her testimony did not demonstrate knowledge sufficient to establish the computer program or GPS device's

---

[3] We are cognizant that Mississippi law "does not require conclusive or ideal proof." *Falcon v. State*, 311 So. 3d 1186, 1189 (¶10) (Miss. Ct. App. 2020). For example, in a criminal prosecution for grand larceny, a Geographic Information System Director for Rankin County was found to be a sufficient witness to  testify and authenticate "historical image data" of three Google satellite images depicting images of a property that the Director used in the course of his job, despite the Director not being a Google or computer programmer, specifically. *Walters*, 206 So. 3d at 535 (¶29).

reliability and accuracy. Therefore, the computer documents were not properly authenticated through Agent Richardson's testimony and should not have been admitted at trial.

¶19. Nevertheless, our analysis does not end there. "Errors in the admission of evidence are subject to a harmless-error analysis." *Smith*, 136 So. 3d at 435 (¶26). This Court will "not reverse a conviction for an erroneous evidentiary ruling unless 'the error adversely affects a substantial right of a party,' or in other words, unless the ruling prejudiced the accused." *Id*. at 435 (¶27). Where "the wrongful admission of the evidence [would] not change the result because there was 'overwhelming evidence of guilt,'" the error is deemed harmless. *Greene v. State*, 282 So. 3d 645, 650 (¶29) (Miss. Ct. App. 2019).

¶20. Here, although the admission of the improperly authenticated computer printout was error, we find that it was harmless error. The printout depicting the coordinates and geographic location of Odom's vehicle was merely evidence showing how Agent Richardson later located Odom's vehicle in Ohio through her investigation. Also, it is important to note that the GPS data evidence from Jason's Auto was not used to place Odom at the scene of the crime. In fact, none of the location data within the exhibit in question places him at the scene on the day of the killing. Furthermore, unrelated testimony and evidence established that the van found in Ohio was registered to Odom and that Odom was ultimately located over a month later in the area where the damaged van was found during a drug raid unrelated to the murder. There was also testimony that the van appeared to have damage consistent with damage expected to result from the crime against Flores. More importantly, evidence of motive was entered establishing that Odom was engaged in an altercation with the victim

10

shortly before the murder took place, failed to report to a scheduled meeting with his employer to discuss the altercation, and never again returned to work at Peco. Thus, without taking into consideration the computer printout, we find that the record still contains overwhelming evidence of Odom's guilt to support the jury's verdict.

### B. Authentication of Vehicle Photographs

¶21. At trial, defense counsel also objected to the introduction of photographs of the van and to Agent Richardson's testimony regarding those photographs. There were two different sets of photographs that counsel contested—the first was a compilation of photographs showing the van when it was located by Ohio investigators as a result of Agent Richardson's search efforts, and the second was a group of photos of the van at Jason's Auto before Odom bought it.

### 1. Vehicle Photographs from Ohio

¶22. On appeal, Odom argues the court erred when it overruled his objection at trial and permitted the introduction of photographs taken by Lima police officers (Lima Police) of the van registered to him because they were not properly authenticated. He claims that Agent Richardson could not authenticate the photographs from the Lima Police because she did not take them and did not have any firsthand knowledge of the condition of the van or whether the photos were accurate representations of the van, where it was found, what condition it was in, etc. Thus, Odom contends that the set of photographs from the Lima Police were inadmissible because no witness with knowledge of the condition or location of the vehicle was called.

¶23. Conversely, the State argues that Agent Richardson was qualified to authenticate the photographs because although she was not the photographer or present when taken, she had sufficient knowledge to offer testimony that the photographs accurately depicted Odom's van. The photos were offered to support Agent Richardson's testimony and explanation that she requested that the Lima Police send her a photograph of the van they located and identification information "before they had it towed to make sure that it was correct vehicle."

¶24. More specifically, photographs from the Lima Police were provided to demonstrate that they located the same van Agent Richardson was looking for in connection with Odom. Agent Richardson testified that she found out the location of the van registered to Odom on March 13, 2018, at GPS coordinates associated with an area in Lima, Ohio. Upon gathering this information, she contacted Lima Police investigators and gave them the location coordinates to locate the van. The Lima Police found a van at the location she gave them and sent her photos of it including a photo of the tag to confirm that it matched the van registered to Odom.

¶25. The admission of photographs is within the trial judge's discretion and will be upheld on appeal unless the admission is shown to be an abuse of discretion. *Dickerson v. State*, 175 So. 3d 8, 21 (¶42) (Miss. 2015). To verify or authenticate a photograph, testimony from the person who took the picture is generally not necessary, but rather, any person with requisite knowledge of the facts is capable of authenticating the photograph. *See* Stafford Young, *Mississippi Trial Handbook*, *in* Mississippi Practice Series § 20:7 (3d ed. updated Nov. 2022) (citing Am. Jur. 2d *Evidence* § 966). Although the actual photographer need not testify

regarding the photographs, there must be some evidence that the pictures accurately reflect the area at the time of the incident. *Jackson v. State*, 483 So. 2d 1353, 1355 (Miss. 1986).

¶26.     This Court has previously held that it was proper to exclude photographic evidence when there was simply "no evidence or testimony as to who took the photographs, when the photographs were taken, or where the photographs were taken." *Est. of Luster ex rel. Gusman v. Mardi Gras Casino Corp.*, 121 So. 3d 962, 966 (¶12) (Miss. Ct. App. 2013).

¶27.     By contrast, Agent Richardson provided sufficient detailed testimony of the specific circumstances of the van photographs. As the sponsoring witness, Agent Richardson initiated and was a party to the communications and exchanges with the Lima Police that resulted in the photographs. She testified that based on her observations of the Mississippi tag pictured on the vehicle and the characteristics of the vehicle in the image, it was a fair and accurate representation of Odom's van portrayed in the photographs from the Lima Police. To be clear, Agent Richardson's testimony "was not conclusive or ideal evidence of authenticity. But, again, Rule 901 does not require conclusive or ideal proof[.]" *Falcon v. State*, 311 So. 3d 1186, 1189 (¶10) (Miss. Ct. App. 2020). The party offering the evidence "need only make a prima facie showing of authenticity," and then "the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Walters*, 206 So. 3d at 535 (¶32). As exhibited in this case, once the threshold for admission is met, the sponsoring witness is still subject to rigorous and skillful cross-examination before the jury determines the weight and credibility to assign to the photographs. *Garcia v. State*, 300 So. 3d 945, 957 (¶27) (Miss. 2020). Agent Richardson's testimony supports a finding that

she had knowledge as to who took the photographs, where the photographs were taken, when the photographs were taken, and the purpose for which the photographs were taken. The photographs from the Lima Police acted as a visual aid confirming the specific van the officers located was a match to the information provided by Agent Richardson.

¶28. Thus, we find that she had sufficient knowledge to testify that the photographs from the Lima Police were of Odom's van, taken over a month after the crime, and the trial court did not abuse its discretion by allowing the photographs into evidence.

### 2. Vehicle Photographs from Jason's Auto

¶29. Odom also claims that three photographs given to Agent Richardson by the owner of Jason's Auto were unauthenticated and inadmissible.[4] His complaint centers around Agent Richardson's testimony that the owner of Jason's Auto provided her with pictures from the company Facebook page of the van for sale prior to being purchased by Odom.

¶30. The State contends that Agent Richardson was able to "sufficiently authenticate that the photographs were of the vehicle before Odom purchased it" on the grounds that the owner of Jason's Auto actually provided her with the photographs, and she further logged onto Facebook to verify that the same photographs were from an advertisement on Jason's Auto's Facebook page. As such, the State claims that the evidence here is what the State purported it to be—a photo provided by Jason's Auto of a car as it previously was held for sale on their Facebook page.

---

[4] He argues that Agent Richardson attempted to "show that the damage depicted in the photographs emailed from the Lima police was recent" by presenting photographs of the vehicle.

¶31.	The first photograph shows the front of the van and is a screenshot of an image (appearing to be from a Facebook post) with the writing "Jason's Auto Sales llc" and "October 22" on it. The second photograph is a picture of the passenger side of the vehicle and the third photograph is of the backseat's interior. The photographs emailed from Jason's Auto were not offered for the purposes of providing the identification of an item, but rather, were offered to demonstrate the alleged appearance of Odom's vehicle before he purchased it. Odom's claim is premised on the argument that because the photographs were ultimately used on Jason's Auto's Facebook page, the authentication requirements were not met for admission of electronic data found on a social media website. Although it is indicated that one of the photographs is a screenshot portrayed in the view of a Facebook post, the photographs were not offered as evidence of electronic communications or as social media-based evidence. *See Taylor*, 353 So. 3d at 1125 (¶¶53-55). They were not obtained by Agent Richardson from a social media provider but, instead, were received directly from Jason's Auto who took the photographs.[5]

¶32.	Because they were not items of social media communications, they are scrutinized

---

[5] We note this distinction in the characterization of the photographs because authentication of social media communication is unique "[b]ecause of the special concerns regarding fabrication[.]" *Smith*, 136 So. 3d at 433 (¶20). "[T]he fact that an electronic communication on its face purports to originate from a certain person's social networking account is generally insufficient standing alone to authenticate that person as the author of the communications." *Id*. Although the photographs at issue here were ultimately placed onto a social media platform or internet source, they are more akin to the evidence properly admitted in the case of *Garcia v. State*, 300 So. 3d 945 (Miss. 2020). There the Mississippi Supreme Court declared that this type of evidence is not held to the same standard as *Smith* because "we are not dealing with an electronic communication purporting to originate from [a] social-media account," such as a Facebook direct message. *Id*. at 973 (¶92).

15

under the same standard as regular photographs. "We have held that the admissibility of photographs rests within the sound discretion of the trial court[,]" and "will be upheld unless there has been an abuse of discretion. This standard is very difficult to meet." *Manix v. State*, 895 So. 2d 167, 177-78 (¶30) (Miss. 2005). In sum, "as an appellate court, we give deference to the trial judge's finding that there was evidence *minimally* '*sufficient* to support a finding that the item is what the proponent claims it is.'" *Greene*, 282 So. 3d at 652 (¶37) (Wilson, P.J., concurring) (emphasis added) (quoting MRE 901(a)). Based on testimony and evidence in the record, the trial court did not abuse its discretion in finding that there was sufficient evidence for the admission of the photographs provided by Jason's Auto of the van as it was previously held for sale.

### C.    Paint-Transfer Evidence and Crime Lab Documents

¶33.    Odom also makes an argument that crime lab documents pertaining to paint-transfer evidence was improperly excluded and therefore hindered his ability to develop his theory of the case. Conversely, the State claims that the evidence was properly excluded as hearsay because no witness was submitted to properly authenticate the scientific submission.

¶34.    Because Agent Richardson could not provide any testimony about the procedures used in collecting or testing the samples, the qualifications of the personnel involved, or the chain of custody related to these samples, the trial court did not abuse its discretion by not allowing the crime lab documents regarding them to be admitted through her testimony. Reports and documentation of this nature are testimonial and certainly can be classified as hearsay. *Conners v. State*, 92 So. 3d 676, 683 (¶¶17-18) (Miss. 2012). Similarly, in a case where the

16

employee of a crime laboratory was not called as a sponsoring witness, it was error to allow DNA reports to be admitted as evidence. *In re Est. of Ivy*, 121 So. 3d 226, 234 (¶39) (Miss. Ct. App. 2012). Further, it is noteworthy that despite this exclusion, the jury still heard testimony that, in fact, paint samples were collected from the victim's car and Odom's van, and compared to each other.

## II. Sufficiency of the Evidence

¶35. Lastly, Odom claims that the evidence at trial was insufficient to support his conviction for the first-degree murder of Flores. "'Substantial evidence' is information of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might have reached different conclusions." *Kirk v. State*, 160 So. 3d 685, 695 (¶25) (Miss. 2015) (quoting *Daniels v. State*, 107 So. 3d 961, 963 (¶11) (Miss. 2013)). To determine the sufficiency of the evidence, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Alvarado v. State*, 343 So. 3d 391, 398 (¶20) (Miss. Ct. App. 2022) (quoting *Nolan v. State*, 61 So. 3d 887, 893 (¶24) (Miss. 2011)). Applying this standard and reviewing the evidence as a whole, we find that the evidence is sufficient for a reasonable juror to find that Odom killed Flores with deliberate design and without excuse or justification, as required for first-degree murder, beyond a reasonable doubt.

¶36. The dissent takes issue with the sufficiency of the evidence presented for first-degree murder. A portion of the dissent's analysis revolves around a discussion of circumstantial

17

evidence and the requisite burden that must be met to prove Odom was guilty of murdering

Flores. In addressing this issue, we are mindful of the Mississippi Supreme Court's recent

ruling in *Nevels v. State*, 325 So. 3d 627, 632 (¶14) (Miss. 2021), where the historical issue

regarding the burden of proof in circumstantial-evidence cases was simplified:

> Basically, what this Court has done over the years is create two different categories—cases in which the State must prove guilt beyond a reasonable doubt and cases in which the State must additionally prove guilt to the exclusion of every reasonable hypothesis consistent with innocence.

The supreme court ultimately concluded,

> '[T]he law makes no distinction between direct and circumstantial evidence but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.' Jurors should not be concerned about whether evidence is 'direct evidence' or 'circumstantial evidence.' They should consider and weigh all of the evidence presented. And 'if the jury is convinced beyond a reasonable doubt, we can require no more.'

*Id*. at 634 (¶20) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)).[6] Our supreme

court's holding expressly overruled the notion that circumstantial evidence cases are subject

to a "heightened" burden of proof as compared to direct evidence cases. *Id*. Again, the

applicable standard we apply here is "whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt." *Alvarado*, 343 So. 3d at 398 (¶20) (quoting *Nolan*,

61 So. 3d at 893 (¶24)). Because direct and circumstantial evidence are given the same

weight, the jury's verdict should also be given the same consideration without regard to

---

[6] "[D]irect evidence is unnecessary to support a conviction so long as sufficient circumstantial evidence exists to establish guilt beyond a reasonable doubt." *Gray v. State*, 328 So. 3d 194, 198 (¶12) (Miss. Ct. App. 2021).

18

whether the evidence is circumstantial or direct.

¶37. "The State was required to prove beyond a reasonable doubt that '(1) [Odom] killed [Flores]; (2) without authority of law; and (3) with deliberate design to effect his death.'" *Id*. at 397 (¶15) (quoting *Williams v. State*, 164 So. 3d 1078, 1080 (¶7) (Miss. Ct. App. 2015)).

¶38. The timecards show Odom clocked out at 4:00 p.m., just two minutes after Flores clocked out. As the dissent points out, this fact is consistent with their normal pattern of concluding their workdays. What makes this day unique is the evidence of a physical altercation between only these two men, which was significant enough to require supervisory intervention. It was also serious enough that it mandated a post-workday meeting with the employer immediately after clocking out of work. Further, the vehicles driven by both men exited the parking lot "somewhat at the same time." On surveillance video, Odom was seen following in the same direction as Flores around 4:00 p.m., trailing only a few seconds behind him. Bergin, who also clocked out around 4:00 p.m., was the first person to discover Flores's wrecked and still-smoking vehicle only 1.75 miles from the Peco parking lot. Bergin pulled over and called 911, which emergency personnel reported at 4:09 p.m. The evidence showed Flores was shot in the head on his left side from the driver's side of the vehicle, and Odom's vehicle was later recovered with what Agent Richardson testified "looked to be a bullet hole on the outside picture." Agent Richardson further explained,

> So the door – where the window meets the door when you roll it down. . . .
> What I observed is a bullet hole damage from a bullet or projectile in the – on
> the right passenger side front window seal, where the window meets the door
> jam. . . . I observed damage on the window seal consistent with a bullet
> impact.

19

In addition, the van had damage on the front passenger side and tire, which she expected based on her observation of Flores's wrecked car.

¶39. Additionally, evidence showed that after Odom clocked out of work, he failed to show up to his 4:00 p.m. meeting with his employer regarding the altercation with Flores, and Odom never again returned to work at Peco. Instead, he kept driving south to Hattiesburg and then to Gulfport. The next morning, he drove his van north, all the way to Ohio, where he then parked it between houses, garages, and a fence. The van remained stationary from February 11 until March 13, when police discovered and towed it. A reasonable jury could find that Odom's actions were an attempt to hide evidence of his involvement in Flores's murder, specifically the damage to his van.

¶40. The dissent also contends that Odom was convicted of "an ill-defined motive" inferred from an alleged altercation that occurred hours before, which no one witnessed. In addition, the dissent notes that no one testified that Odom had threatened Flores's life. However, the evidence indicates their altercation that morning was physical and was significant enough that it warranted separation of their work spaces and an office meeting with their employer. The record also shows that Odom became frustrated that Flores put his hands on Odom. The timeline of events is also notable here: the murder occurred immediately after Odom and Flores left work and were each supposed to be going to their meetings to discuss the altercation. Another Peco worker testified that employees are subject to disciplinary action or termination if they get into fights with each other.

¶41. "Deliberate design to kill a person may be formed very quickly, and perhaps only

20

moments before the act of consummating the intent." *Alvarado*, 343 So. 3d at 397 (¶16) (quoting *Ashmore v. State*, 302 So. 3d 707, 714 (¶20) (Miss. Ct. App. 2020)). It also "may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Id*. Another method "intent may be prove[d] is by showing the acts of the person involved at the time, and by showing the circumstances surrounding the incident." *Id*. (quoting *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015)).

¶42. Looking at all the evidence presented and evaluated by the jury chosen to hear this case, we find that the evidence was sufficient for a rational trier of fact to find the essential elements of first-degree murder beyond a reasonable doubt.

## CONCLUSION

¶43. We find that the trial court did not abuse its discretion by admitting the photographs of Odom's van, the admission of the Jason's Auto computer documents was harmless error, and the exclusion of crime lab documents was not error. Further we find that Odom's first-degree murder conviction was supported by sufficient evidence. As such, we affirm the trial court's judgment of conviction and sentencing.

¶44. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. WESTBROOKS, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY McDONALD, J.**

**WESTBROOKS, J., DISSENTING:**

21

¶45. Because the State failed to present sufficient evidence for a rational juror to find beyond a reasonable doubt that Odom shot and killed Flores, I cannot join the majority. The State had the burden to prove Odom's guilt *beyond a reasonable doubt*. In my opinion, again, the State fell short of meeting this burden due to the insufficient evidence presented to the jury. It is deeply troubling that Odom was convicted of first-degree murder because of an ill-defined motive inferred from an alleged altercation that occurred at work between him and the victim. No murder weapon was recovered, and no gun residue was found on Odom or his vehicle. There was nothing linking Odom to this murder. Therefore, I respectfully dissent.

**FACTS AND PROCEDURAL HISTORY**

¶46. Jonathan Odom, Salvador Flores,[7] and Ernest Plummer were employees at a "temp" agency called Onin Staffing. In late 2017, they were assigned to work on a project at Peco Foods in Sebastopol, Mississippi. On February 8, 2018, there was an alleged altercation between Odom and Flores. No one witnessed this incident, and there were no security cameras in the area to capture it. Odom and Flores informed John Bergin, their supervisor, about their disagreement. In response, Bergin sent them to work in different locations. When asked about the demeanor of the two men, Bergin testified that they were "frustrated," but it was "nothing unusual" in that line of work. They stayed separated for the remainder of the day, and there were no subsequent issues. Hours later, Odom and Flores both clocked

---

[7] Individuals at Peco knew and referred to him as Salvador Flores. During voir dire, the State revealed that he was an illegal immigrant in the country and that his real name was Hector Garcia. Both names are used throughout the record.

out at their regularly scheduled departure time.[8] Their timecards were entered into evidence showing that Flores clocked out at 3:58 p.m., and Odom clocked out at 4:00 p.m., their regular departure time. Jodie Edwards, their co-worker, testified that he saw and spoke to them before they left, and he did not witness any issues between them. Video surveillance of the employee parking lot and driveway of the facility was also entered into evidence. The footage showed Flores leaving out of the south side facility entrance and heading south toward Forest, Mississippi. The footage also showed Odom leaving out of the north side facility entrance and heading south toward Forest, Mississippi. Odom's reported residence was in Forest.

¶47. Bergin testified that while heading south after work, he approached a smoking car that was in a ditch. He realized the occupant was bleeding and unresponsive, so he called 911. The occupant was later identified as Salvador Flores. Flores was pronounced dead on the scene after a paramedic detected a bullet hole behind one of Flores' ears and observed brain matter on the dashboard.

¶48. Agent Heather Richardson, an investigator with the Mississippi Bureau of Investigations (MBI), was called to the scene. She testified that she retrieved Flores' phone and answered a call from Elvia Jiguan, his wife. During this conversation, Agent Richardson confirmed Flores' identity, learned about his place of employment, and learned that Flores was headed to a meeting at Onin Staffing. Agent Richardson visited Peco the next day to

---

[8] Carlie Cox, the hatchery manager at Peco, testified that Odom and Flores worked primarily Monday through Friday and would arrive at Peco around 7:00 a.m. and would leave "every day pretty much at 4 p.m."

follow up on her investigation. After interviewing Cox and other employees at Peco, she learned about the alleged altercation and requested physical evidence. She received timecards for Odom, Flores, and Plummer and testified that they all clocked out around the same time on the day in question. The timecards revealed that Odom and Flores did not show up on February 9, 2018, and that Plummer left early in the morning before Agent Richardson had arrived. Thereafter, neither Odom nor Plummer ever returned to Peco. Agent Richardson testified that she was never able to locate Plummer. When asked if she looked up any information about Plummer's vehicle or firearms, she said she believed she had some information about his vehicle, but she had not done any research about his firearms.

¶49. While at Peco, Agent Richardson also reviewed video surveillance footage, which showed Odom leaving in a silver van. She ran checks and obtained records revealing that Odom purchased the vehicle from Jason's Auto Sales. Jason's Auto had a lien on the car, which had a GPS tracking device installed on it. Agent Richardson obtained a warrant for the GPS information tracking Odom's vehicle. It revealed that the vehicle was pinged in three locations: Hattiesburg, Mississippi; Gulfport, Mississippi; and Lima, Ohio. She testified that she did not travel to or investigate either of the Mississippi locations. She did, however, contact the Lima Police Department in Ohio. She gave the Lima Police the location of Odom's vehicle. Lima Police officers located the silver van, took photos of it, and had it towed. Agent Richardson testified that the photographs revealed damage on the passenger side and its front tire and a bullet lodged in the passenger door. She relied on the

24

photographs to obtain a search warrant for the van and an arrest warrant for Odom. Agent Richardson never saw or examined the van in person. She never had the car towed back to Mississippi, and she never sent an investigator to Ohio to examine the van or collect evidence.

¶50. On April 12, 2018, Odom was at a residence in Lima when law enforcement officers arrived to execute a search warrant on the house. Odom was not the target of the warrant; however, he was arrested on suspicion of murder after he identified himself. He was extradited to Mississippi on April 24, 2018, and booked into the Scott County jail.

¶51. On July 9, 2021, Odom was tried in the Scott County Circuit Court. A jury found him guilty of first-degree murder, and he was subsequently sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC).

## DISCUSSION

¶52. Rulings on the sufficiency of the evidence claims are reviewed de novo. *Turner v. State*, 291 So. 3d 376, 383 (¶20) (Miss. Ct. App. 2020). "When considering the legal sufficiency of the evidence, this Court views the evidence in the light most favorable to the State to determine if any rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Benthall v. State*, 311 So. 3d 697, 703 (¶20) (Miss. Ct. App. 2021) (citing *Martin v. State*, 214 So. 3d 217, 222 (¶15) (Miss. 2017)). Although we examine evidence in the light most favorable to the State, we must also "keep[] in mind the beyond-a reasonable-doubt burden of proof standard." *Buchanan v. State*, 316 So. 3d 619, 630 (¶49) (Miss. 2021) (quoting *Haynes v. State*, 250 So. 3d 1241, 1244 (¶6) (Miss. 2018)).

"This burden must be satisfied with evidence, not speculation or conjecture." *Id*. (citing *Edwards v. State*, 469 So. 2d 68, 69-70 (Miss. 1985); *Sisk v. State*, 294 So. 2d 472, 475 (Miss. 1974)). "Where the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable jurors could not have found beyond a reasonable doubt that the defendant was guilty, the proper remedy is . . . to reverse and render.'" *Dean v. State*, 295 So. 3d 575, 578 (¶8) (Miss. Ct. App. 2020) (quoting *Williams v. State*, 35 So. 3d 480, 485 (¶16) (Miss. 2010)).

¶53.    "When reviewing a defendant's attack on the sufficiency of the evidence presented at trial, we must consider each element of the offense." *Allen v. State*, 309 So. 3d 453, 459 (¶21) (Miss. Ct. App. 2019) (citing *Smith v. State*, 250 So. 3d 421, 424 (¶21) (Miss. 2018)). Mississippi Code Annotated section 97-3-19(1)(a) (Supp. 2017) defines first-degree murder as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed." Accordingly, to convict Odom of first-degree murder, the prosecution had to prove that Odom (1) killed Flores (2) without authority of law (3) but with the deliberate design to effect his death.  Miss. Code Ann. § 97-3-19(1)(a).

¶54.    The State failed to present sufficient evidence to prove beyond a reasonable doubt that Odom killed Flores.  The facts that the State relied on to illustrate its theory did not establish a direct causal link between Odom's actions and Flores' cause of death.  The State based the entire case on circumstantial evidence that simply raised the suspicion of Odom.

¶55.    I acknowledge that *Nevels* "reaffirmed the principle that 'circumstantial evidence is

given the same weight as direct evidence' and there is no heightened burden of proof for circumstantial evidence." *Haymon v. State*, 346 So. 3d 875, 881 (¶16) (Miss. 2022) (quoting *Nevels v. State*, 325 So. 3d 627, 629, 632 (¶¶2, 14) (Miss. 2021)). I respect our Supreme Court's decision to take out the reasonable hypothesis language in the standard, and I agree that there is not a heightened burden of proof in circumstantial evidence cases. "[I]n all criminal cases, there is but one burden of proof—guilt beyond a reasonable doubt." *Nevels*, 325 So. 3d at 631 (¶12). However, I also agree with Justice Kitchens' dissent stating that the reasonable hypothesis language is still a "part and parcel of reasonable doubt." *Id*. at 640 (¶39). "There is no higher burden of proof. . . . [T]here is a 'necessary qualification that in order for [the defendant's] guilt to appear beyond a reasonable doubt the evidence must exclude every other reasonable hypothesis consistent with his innocence.'" *Id*. at 642 (¶44) (quoting *Warren v. State*, 166 Miss. 284, 146 So. 449, 449 (1933)).

¶56. However, even without the reasonable hypothesis language, we must still strictly hold the State to the beyond-a-reasonable-doubt standard to overcome the presumption of innocence and "reduce the odds of convicting the innocent of unseen, unconfessed crimes." *Nevels*, 325 So. 3d at 637 (¶33). As *Nevels* points out in its majority opinion, this standard "'plays a vital role in the American scheme of criminal procedure,' because it operates to give 'concrete substance' to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding." *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (quoting *In re Winship*, 397 U.S. 358, 363 (1970)).

27

¶57. Here, when reviewing the insufficient evidence that was presented to the jury, it is clear that the State failed to meet its burden to prove that Odom killed Flores beyond a reasonable doubt. The case is premised on an alleged altercation between Odom and Flores that occurred hours before Flores was murdered and that no one witnessed.

¶58. The facts highlighted by the majority do not prove guilt beyond a reasonable doubt. They continue to characterize Odom and Flores' disagreement as a physical altercation. The only evidence in the record that indicates that the altercation was physical was testimony from Agent Richardson that during her investigation, "[i]t was reported that Jonathan had told multiple people at Peco that Mr. Garcia had put his hands on him in some form or fashion." Agent Richardson did not provide any names of these employees that she allegedly interviewed, and the State did not call any of these employees to testify about what Odom told them. This testimony was admitted over Odom's objection. With no names and no testimony from these specific employees to substantiate this claim, this testimony was substantially unreliable. The majority acknowledges that Odom and Flores left "somewhat at the same time," yet the record reveals that they typically left around the same time every day. Furthermore, Odom was headed in the direction of his home in Forest. The majority points out that Bergin also clocked out around 4:00 p.m. and was the first person to discover Flores. However, Bergin testified that the road Flores was found on was a high-traffic road, especially at the end of a work day:

> Q.  All right. On Highway 21 at this juncture, is it a low traveled road, Mr. Bergin, or is it a high volume travel road?
>
> A.  It's high volume certain times of day.

28

> Q. Okay. When work is let off, shifts change, in the afternoon, would you consider it a high volume traveled road?
>
> A. Yes.

And yet no one could testify that they saw the contact between the vehicles or the killing. Other facts that contradict Odom's guilty verdict include the possibility that someone else was present at the time the victim died and that this person was the perpetrator who killed the victim. Plummer was never located, questioned, or investigated by Agent Richardson. He clocked out around the same time that Odom and Flores did on the day in question. He left work early the next morning before Agent Richardson arrived at Peco, and Plummer never returned.

¶59. This alternative is bolstered by the fact that there was no testimony from Bergin claiming that Odom threatened (or had given him pause to believe that Odom threatened) Flores' life. In fact, Bergin testified that their frustration with each other was "nothing unusual" in that line of work. Bergin testified that after separating the two men, it "was the last [he] heard of it." Additionally, there was no testimony from Edwards that there were any issues between them on their way out. Edwards further testified that Odom and Flores were friends and that he had "never saw anything that made [him] think otherwise" prior to that day. The two men never had any problems before this disagreement.

¶60. The majority also notes Agent Richardson testified that she observed "what looked to be a bullet hole on the outside picture." However, Agent Richardson testified that she never physically saw the window to make that determination. Furthermore, no bullets or shell casings were ever recovered.

¶61. The timecards and video surveillance footage entered into evidence showed nothing other than Odom and Flores leaving at their regularly scheduled business hour. Agent Richardson testified she learned that Onin Staffing scheduled meetings with Odom and Flores concerning the altercation, yet no evidence was entered documenting this. Flores had a gunshot wound on his head, yet no murder weapon or any evidence linking Odom to a gun was introduced.

¶62. Using timecards, surveillance footage, and photographs of Odom's van, Agent Richardson developed the theory that Odom caught up to Flores on Highway 21, shot into Flores' car through his open passenger window, and made contact with Flores' car, causing him to hit the culvert and land in the yard. In efforts to substantiate this alleged collision theory, Agent Richardson wanted a paint comparison analysis conducted on both vehicles. However, the test results proved that the samples did not match. During cross-examination, defense counsel revealed the inconsistency in the State's theory:

> Q. Agent Richardson, you gave theory to the jury about why you think Jonathan Odom is the person involved in the death of Mr. Garcia. And you said one of the things is that there's a car belonging to Mr. Garcia that was damaged in the wreck that you believe also come into contact with the vehicle belonging to Mr. Odom. Correct?
>
> A. Correct.
>
> Q. So going down the road and the two cars hit. When the two cars hit, obviously, paint will transfer. Correct?
>
> A. That's correct.
>
> Q. In your investigation, did you remove paint off Mr. Garcia's car?
>
> A. Yes.

Q. All right. Did you have paint removed off of Mr. Odom's van?

A. Yes.

Q. Did that paint match?

A. No, not according to the records given by the Crime lab.

Q. Okay. So your theory is they met and wrecked, but the paint shows that there's no match. Correct?

A. That's correct.

Odom later attempted to introduce the test results; however, the court excluded this exonerating evidence due to "chain of custody issues." Despite the report not being entered into evidence, Agent Richardson still made the jury aware that the paint samples did not match. The very fact that the paint samples did not match is significantly probative on the issue that there was no impact between Odom's and Flores' vehicles. Under these circumstances, the State's presented theory did not prove Odom's guilt beyond a reasonable doubt.

¶63. I must depart from the majority opinion. No rational juror could have concluded that the State proved *beyond a reasonable doubt* that Odom killed Flores. Based on the insufficient circumstantial evidence presented in this case, I would reverse Odom's conviction and sentence.

**McDONALD, J., JOINS THIS OPINION IN PART.**